983 F.2d 587
 61 USLW 2423
 ARLINGTON COUNTY REPUBLICAN COMMITTEE; Kevin Allen; Morton
Blackwell; Joseph Evans; Mary N. Dabinett; John F. Dolan;
Paul Haire; Thomas Heckard; Eugene Iwanciw; Daniel J.
Murphy; Deborah M. Phillips; Donna Wiesner; Arlington
Libertarian Committee; Duncan Sellars; Richard E. Sincere,
Jr.; Michael D. Ward, Plaintiffs-Appellees,
v.
ARLINGTON COUNTY, VIRGINIA; Susan Ingraham, Zoning
Administrator, Defendants-Appellants.
 No. 92-1655.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 28, 1992.
Decided Jan. 4, 1993.
As Amended Jan. 21, 1993.
 
 Cynthea Lee Perry (argued), Special Counsel, Charles G. Flinn, on brief, County Atty., Arlington, VA, for appellants.
 Victor Michael Glasberg (argued), Victor M. Glasberg & Associates, Jeanne Goldberg, Victor M. Glasberg & Associates, John Kenneth Zwerling, William Moffitt, Moffitt, Zwerling & Kemler, P.C., Alexandria, VA, Stephen B. Pershing, American Civil Liberties Union Foundation of Virginia, Richmond, VA, for appellees.
 Before MURNAGHAN, NIEMEYER, and HAMILTON, Circuit Judges.OPINION
 HAMILTON, Circuit Judge:
 
 
 1
 Arlington County, Virginia (the County) appeals the district court's grant of summary judgment in favor of the plaintiffs-appellees (the Political Parties), and the subsequent injunction enjoining the County from enforcing parts of its ordinance governing the display of signs. 790 F.Supp. 618 (E.D.Va.1992). The challenged provisions of the ordinance, enacted as section 34 of the Arlington County Code, included: § F.4.f. and § E.7., limiting the number of temporary signs that an owner could place on his property to two; § C.7., prohibiting certain noncommercial portable signs; § G.1., prohibiting noncommercial signs on commercial property; and § A.1., providing a set time within which the County had to reject applications for temporary sign permits and provide reasons for any rejection. The County also appeals the district court's award of attorneys' fees in favor of the Political Parties.
 
 
 2
 We agree with the district court's conclusion that the two-sign limit provisions impermissibly infringed on the Political Parties' First Amendment guarantee of freedom of speech. Thus, we affirm that portion of the district court's decision. However, we disagree with the district court's conclusion that the three remaining challenged provisions (§§ C.7., G.1., and A.1.) also violated the Political Parties' First Amendment rights and, therefore, reverse that part of the district court's decision. Because the County subsequently amended these three remaining provisions, the practical effect of this reversal is to vacate and remand the award of attorneys' fees so that the district court may consider modifying this award in light of our decision. Finally, we vacate the permanent injunction against enforcement of these three remaining provisions, since the County's subsequent amendment renders the injunction moot as to these three provisions.
 
 
 3
 * Arlington County adopted ordinance # 90-39 on December 8, 1990, effective February 15, 1991. As originally passed, the challenged portions of the ordinance: (1) limited the number of temporary signs that could be posted in residential districts (two-sign limit); (2) allowed seven work days for the processing of permit applications (waiting period); (3) exempted only owner identification signs from a general ban on portable signs displayed on vehicles (portable sign provision); and (4) limited the content of signs displayed at commercial sites (commercial establishment sign provision). Arlington Co.Code § 34.[1]
 
 
 4
 On October 18, 1991, the Arlington County Republican Committee, along with several other political parties and individual candidates for election, instituted this action in the United States District Court for the Eastern District of Virginia, seeking a preliminary injunction against the County to prohibit enforcement of the challenged provisions within this ordinance. On October 25, 1991, the district court issued the requested preliminary injunction. After the Arlington County general election on November 5, the Political Parties returned to court, this time seeking to permanently enjoin the County from enforcing the challenged provisions of the ordinance.
 
 
 5
 In the proceedings before the district court, the Political Parties argued that the challenged provisions violated their First Amendment guarantee of freedom of speech. Specifically, they argued that the two-sign limit prevented both the Political Parties and individual homeowners from expressing their political views. The County defended this provision on the basis that it furthered the County's substantial interests in promoting aesthetics and traffic safety. To rebut these interests, the Political Parties introduced evidence showing the lack of any specific aesthetic or traffic safety problems during the period the preliminary injunction was enforced. Thus, the Political Parties claimed that the County did not narrowly tailor its ordinance to further its stated interests.
 
 
 6
 With respect to the portable sign and commercial establishment provisions, the Political Parties asserted that these provisions impermissibly favored commercial speech over noncommercial speech. For example, the Political Parties hypothesized that the portable sign section allowed a sign reading "Don Beyer's Volvo" but not "Vote for Don Beyer." In addition, the commercial establishment sign provision allowed a supermarket to post a sign advertising "a free pot with every chicken," but not a sign advertising a candidate "promising to put a chicken in every pot." The County defended these provisions on the basis that it had historically construed the ordinance to allow noncommercial speech wherever commercial speech was permitted. The County claimed that this interpretation rendered the Political Parties' challenges to those three provisions nonjusticiable.
 
 
 7
 Finally, with respect to the seven-day waiting period, the Political Parties asserted that the seven days in which the ordinance allowed the County zoning administrator to decide on permit applications effectively prevented spontaneous, last minute sign posting. Thus, the Political Parties claimed that the waiting period also infringed on their freedom of speech. The County responded with two arguments. First, it argued that the waiting period necessarily allowed the zoning administrator sufficient time to review applications for large, complex, permanent, commercial signs. Second, the County claimed that it historically decided on applications for temporary sign permits immediately. Thus, the County argued that the Political Parties' challenge to this provision was also nonjusticiable.
 
 
 8
 The district court rejected the County's arguments for all of the challenged provisions, and held that the challenged provisions violated the First Amendment. The district court explained that the County did not narrowly tailor the two-sign limit or the waiting period provisions to serve its stated interests, and that the commercial establishment and portable sign provisions impermissibly favored commercial speech over noncommercial speech. In reaching this decision, the district court rejected the idea that the Political Parties' challenges to the commercial establishment, portable sign and waiting period provisions were nonjusticiable. The district court explained that facially unconstitutional statutes could not be saved by narrow interpretations.
 
 
 9
 In reviewing the district court's decision, we find it helpful to analyze the two-sign limit separately from the other three challenged provisions.
 
 II
 
 10
 In reviewing the challenge to the two-sign limit, the district court first analyzed whether existing case law controlled its decision. Finding no controlling case law, the district court then undertook the test established by the Supreme Court to determine the constitutionality of statutes under the First Amendment. We adopt the same approach.
 
 
 11
 * Existing Case Law
 
 
 12
 On appeal, the County claims that Supreme Court precedent and subsequent Fourth Circuit interpretations expressly allow restrictions on temporary political signs in residential neighborhoods. The County primarily relies on Supreme Court precedent established in Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), and Metromedia, Inc v. San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion), as well as subsequent Fourth Circuit interpretations of Vincent and Metromedia, established in Naegele Outdoor Advertising v. Durham, 844 F.2d 172 (4th Cir.1988); Georgia Outdoor Advertising, Inc. v. Waynesville, 833 F.2d 43 (4th Cir.1987); and Major Media of the Southeast v. Raleigh, 792 F.2d 1269 (4th Cir.1986), cert. denied, 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987). However, we find none of these cases provides authority for imposing the two-sign limit in the present case.[2]
 
 
 13
 In reaching this conclusion, we begin with the venerable principle that "[e]ach medium of expression ... must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 557, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975). See also, Metromedia, 453 U.S. at 502, 101 S.Ct. at 2889; FCC v. Pacifica Foundation, 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978); Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952). Thus, our analysis of the precedent cited by the County focuses on whether those cases specifically address restrictions on temporary political signs on residential property.
 
 
 14
 In Metromedia, the Court first addressed the extent to which governments can restrict billboards in the interest of promoting aesthetics and traffic safety.[3] The City of San Diego passed a law banning permanent signs anywhere but in industrial zones. However, the ordinance specifically exempted on-site billboards "advertising goods or services available on the property where the sign is located." 453 U.S. at 503. Several companies owning billboards within the city challenged the ordinance as an unconstitutional suppression of speech.
 
 
 15
 In a badly divided Court, a plurality of four Justices rejected the ordinance solely because it impermissibly preferred commercial speech over noncommercial speech. Absent this preference, the plurality could find no constitutional problem. Id., 453 U.S. at 512, 101 S.Ct. at 2895. The concurring opinion rejected the ordinance because it totally prohibited a protected form of speech without sufficient justification and was not narrowly drawn. Id. at 528-30, 101 S.Ct. at 2903-04 (Brennan, J., concurring). The three dissenting opinions generally concluded that a city may constitutionally ban all billboards, and that allowing some commercial signs did not invalidate the ordinance. Id. at 542, 560-61, 570, 101 S.Ct. at 2910, 2919-20, 2924 (Stevens, J., Burger, C.J., Rehnquist, J., dissenting in separate opinions). Thus, without an impermissible preference of commercial speech over noncommercial speech, seven Justices would have upheld the prohibition on billboards as an acceptable means to promote aesthetics and traffic safety.
 
 
 16
 However, the statute in Metromedia specifically excluded "temporary political campaign signs" from regulation. Id. at 495, 101 S.Ct. at 2886. In addition, the state court in Metromedia defined the scope of the ordinance to proscribe only permanent signs, specifically intending to avoid prohibitions on "a small sign placed in one's front yard proclaiming a political or religious message." Id. at 494 n. 2, 101 S.Ct. at 2885 n. 2. The Court accepted this interpretation, holding that "[w]e deal here with the law of billboards," and defining billboards as "large, immobile and permanent structure[s]." Id. at 501, 502, 101 S.Ct. at 2889, 2890.[4]
 
 
 17
 In Vincent, the Court again considered the government's power to ban signs in the interests of aesthetics and traffic safety. In Vincent, the City of Los Angeles passed an ordinance "prohibit[ing] the posting of signs on public property." 466 U.S. at 792, 104 S.Ct. at 2122. Supporters of a candidate for election in Los Angeles challenged the ordinance under the First Amendment in an effort to prevent the city from removing campaign signs which they had posted on utility poles throughout the city. The Court upheld the ordinance, reasoning that "the visual assault on citizens ... presented by an accumulation of signs posted on public property constitutes a significant substantive evil within the City's power to regulate." Id. at 807, 104 S.Ct. at 2130.
 
 
 18
 However, in reaching its decision, the Vincent Court expressly distinguished banning signs on public versus private property. The plaintiffs in Vincent challenged the law in part because they believed it impermissibly favored speech on private property. The Court rejected this argument, reasoning that "[t]he private citizen's interest in controlling the use of his own property justifies the disparate treatment." Id. at 811, 104 S.Ct. at 2132.
 
 
 19
 In the wake of these Supreme Court decisions, we also considered First Amendment challenges to various ordinances regulating the display of signs. Such a challenge first arose in this circuit in Major Media of the Southeast v. Raleigh, 792 F.2d 1269 (4th Cir.1986), cert. denied, 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987). In that case, the City of Raleigh enacted a statute, the relevant portions of which confined the location of off-premise signs to industrial zones and limited their size to 150 square feet when facing four-lane streets and seventy-five square feet when facing two-lane streets. Id. at 1270. The statute gave existing sign owners five and one-half years to satisfy these requirements. Although the court described the ordinance as regulating signs, the size limits and grace period clearly indicate that the ordinance applied only to large, permanent signs.
 
 
 20
 A company owning several billboards in the city challenged the ordinance as an abridgment of its First Amendment rights and as an invalid taking of property. This court rejected the First Amendment challenge, reasoning that Metromedia allowed prohibitions on "all off-premise signs or billboards for aesthetic and [traffic] safety reasons," absent any preference for commercial speech over noncommercial speech. Id. at 1272. Thus, this court concluded that the ordinance "does not impermissibly burden commercial speech." Id.
 
 
 21
 This court again scrutinized a similar ordinance under the First Amendment in Georgia Outdoor Advertising v. City of Waynesville, 833 F.2d 43 (4th Cir.1987). In that case, the City of Waynesville enacted an ordinance "effectively outlaw[ing] all ... billboards within the jurisdiction of the City." Id. at 44. A company owning numerous billboards within the city challenged the ordinance under the First Amendment, claiming that it impermissibly "outlawed a protected form of expression, commercial off-premise advertising." Id. This court rejected this claim, again reasoning that Metromedia allowed a city to "prohibit all off-premise signs or billboards for aesthetic and [traffic] safety reasons...." Id. at 45 (quoting Raleigh, 792 F.2d at 1272).
 
 
 22
 Most recently, this court addressed a First Amendment challenge to a sign ordinance in Naegele Outdoor Advertising v. City of Durham, 844 F.2d 172 (4th Cir.1988). In that case, the City of Durham adopted "a billboard ordinance prohibit[ing] all commercial, off-premise advertising signs except alongside interstate or federally-aided primary highways." Id. at 173. An owner of numerous billboards in Durham challenged this ordinance under the First Amendment. This court again rejected the challenge, citing Waynesville and Raleigh for the principle that a city may constitutionally prohibit "off-premise commercial billboards" to protect aesthetics and traffic safety. 844 F.2d at 173.
 
 
 23
 We find none of our precedent controls the precise issue before this court for two reasons. First, the ordinances in our previous cases regulated billboards rather than temporary signs. Although these cases explained that Metromedia permitted a ban on "all off-premise signs or billboards for aesthetic and [traffic] safety," this language should not be read to extend to restrictions on temporary political signs on residential property. As previously discussed, Metromedia only established "the law of billboards," 453 U.S. at 501, 101 S.Ct. at 2889, and expressly recognized the inherently unique concerns in regulating billboards.[5]
 
 
 24
 Second, in all of the Fourth Circuit precedent discussed above, either the plaintiff challenged the ordinance as an impermissible burden on commercial speech (Durham and Waynesville ), or we concluded that the ordinance did not impermissibly burden commercial speech (Raleigh ). In contrast, the two-sign limit in the present case infringes on political speech. The Supreme Court consistently affords more protection to political speech than commercial speech. Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). See also, Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983), ("[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values' and is entitled to special protection.") (citation omitted). Thus, the two-sign limit in the present case requires more exacting scrutiny.
 
 B
 The Test Under the First Amendment
 
 25
 Finding no dispositive precedent, we must analyze the two-sign limit under the Supreme Court's test for determining whether a statute violates the First Amendment guarantee of freedom of speech. Under this test, we first question whether the two-sign limit burdens any speech. If we find any burden, we must then determine whether the two-sign limit imposes content neutral or content based restrictions. If it is content neutral, we must then decide whether the two-sign limit serves any substantial interest of Arlington County. If the County identifies any interest, we must then determine whether the County narrowly tailored the two-sign limit to further this stated interest. Finally, we must also assess whether the two-sign limit leaves open ample alternative means for communicating the desired message. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).
 
 
 26
 We agree with the district court that the two-sign limit affects speech rather than conduct. "Communication by signs and posters is virtually pure speech." Baldwin v. Redwood, 540 F.2d 1360, 1366 (9th Cir.1976), cert. denied, sub nom. Leipzig v. Baldwin, 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977) (footnote omitted). In addition, we agree that the two-sign limit infringes on this speech by preventing homeowners from expressing support for more than two candidates when there are numerous contested elections.[6] Also, if two voters living within the same household support opposing candidates, the two-sign limit significantly restricts their ability to express support through sign posting.
 
 
 27
 Since the two-sign limit burdens the freedom of speech, we next question whether those provisions impose content neutral or content based restrictions. Initially, the Political Parties claimed that the two-sign limit might be content based, since it exempted trespassing, for rent, and for sale signs. However, at oral argument they conceded that this was not the gravamen of their complaint. Since we invalidate the two-sign limit on other grounds, we assume for purposes of analysis that those provisions are content neutral.
 
 
 28
 Under the content neutral test, we must assess whether the two-sign limit furthers any substantial governmental interest. As discussed earlier, the County defends the two-sign limit by arguing that it promotes aesthetics and traffic safety. We agree with the district court's decision that these are substantial governmental goals. Vincent, 466 U.S. at 805, 104 S.Ct. at 2129; Metromedia, 453 U.S. at 507-08, 101 S.Ct. at 2892-93.
 
 
 29
 Having found two substantial governmental interests, we next focus on whether the County narrowly tailored the two-sign limit to further these interests. We agree with the County that under this test, we cannot question whether narrowly tailoring the statute requires allowing more than two signs. Such a limit is a legislative decision, not reviewable by courts. See, e.g., Bd. of Trustees of State University of New York v. Fox, 492 U.S. 469, 478, 109 S.Ct. 3028, 3033, 106 L.Ed.2d 388 (1989) (Narrowly tailoring a statute does not "require elimination of all less restrictive alternatives.") (citations omitted).
 
 
 30
 However, this court may require the County to justify its chosen restrictions by demonstrating a necessity for the two-sign limit.[7] Under this part of the analysis, we question whether the County needs to limit the number of signs on private property to protect aesthetics. As the Court noted in Vincent, "[p]rivate property owners' esthetic concerns will keep the posting of signs on their property within reasonable bounds." 466 U.S. at 811, 104 S.Ct. at 2132. We also find persuasive the fact that the County could not show any specific aesthetic or traffic problems arising while the preliminary injunction was in force. In contrast, the district court found that after issuing the preliminary injunction, "additional signs posted were neatly displayed and not unreasonably numerous." Joint Appendix (J.A.) at 234.
 
 
 31
 In addition, it is evident that the County could promote its interests through other, less restrictive means. First, the County could regulate the design and condition of these signs. Second, to ensure traffic safety the County could prevent posting signs within a certain distance of the street. Third, limiting the duration of these signs also furthers the County's interest.[8]
 
 
 32
 Finally, we agree with the district court that the two-sign limit did not provide sufficient alternatives for political speech. The County suggests several viable alternatives, including speeches in public places, door to door and public canvassing, distributing handbills, appearing at citizen group meetings, advertising, posting signs in local businesses and automobiles,[9] and posting two signs at private residences. However, we agree with the district court that these alternatives are insufficient in that they require too much time involvement (e.g., handbilling or canvassing), or too much expense.
 
 
 33
 In addition, the County's laundry list fails to recognize that the two-sign limit infringes on the rights of two groups: the candidates and the homeowners. Homeowners also express their views by posting political signs in their yard. In Vincent, the Court upheld the restraint on public signs in part because the speaker could still "exercise his right to speak and distribute literature in the same place where posting of signs on public property is prohibited." 466 U.S. at 812, 104 S.Ct. at 2132-33 (emphasis added). Here, there is no viable alternative to the homeowner on his property.
 
 
 34
 In summary, we find that the County did not narrowly tailor the two-sign limit to further its interests in promoting aesthetics and traffic safety. In addition, we find that the provision leaves no viable alternative means of political speech. Thus, we find the two-sign limit violated the First Amendment rights of the Political Parties.
 
 III
 
 35
 The Political Parties challenged the commercial establishment and portable sign provisions on the basis that they impermissibly favored commercial speech over noncommercial speech. In addition, the Political Parties challenged the waiting period provision on the basis that it effectively prevented spontaneous, last minute posting of political signs. In response, the County argued that it historically allowed noncommercial speech wherever the ordinance allowed commercial speech, and that it historically decided on applications for temporary sign permits immediately. The Political Parties presented no evidence refuting these alleged interpretations and applications of the challenged provisions of the ordinance. Thus, the County argued that its narrow interpretations and applications of these provisions created no actual case or controversy before the district court.
 
 
 36
 The district court rejected the County's claim that its narrow interpretation and application of the commercial establishment, portable sign and waiting period provisions rendered the Political Parties' challenges to these provisions nonjusticiable. Instead, the district court accepted the Political Parties' argument that narrow interpretations can only save a vague statute which is subject to several possible interpretations. J.A. at 28-29. The district court explained that these three challenged provisions in the present case contained precise language and that "[t]his court declines to write non-binding limits ... into an ordinance whose meaning is plain." J.A. at 29, 33, and 34. The district court then held that these provisions violated the First Amendment guarantee of freedom of speech.
 
 
 37
 We disagree with the district court's conclusion that the County's narrow interpretation and application could not protect these three provisions from constitutional attack. Supreme Court precedent recognizes that a party may have no justiciable challenge to a particular statute if government interpretations preclude enforcement of that statute as written. For example, in Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), the Court refused to enjoin a local ordinance that prohibited picketing in front of an establishment. The Court construed the statute narrowly so as to avoid any constitutional problem, relying on statements by the city, "which indicate that the town takes, and will enforce, a limited view of the 'picketing' proscribed by the ordinance." Id. at 484, 108 S.Ct. at 2502. In addition, in Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), the Court held that a challenge to a ban on contraceptives presented no justiciable question even though the law was clear on its face, because the state never enforced the law. The Court reasoned, "deeply embedded traditional ways of carrying out state policy ... or not carrying it out ... are often tougher and truer law than the dead words of the written text." Id. at 502, 81 S.Ct. at 1755.[10]
 
 
 38
 In the present case, the County's uncontradicted evidence indicates that its historical interpretation and application of the commercial establishment, portable sign, and waiting period provisions did not result in enforcement of those provisions as written. Thus, we think the Political Parties' challenges to those three provisions were nonjusticiable.
 
 IV
 
 39
 After the ruling by the district court, the County amended the commercial establishment, portable sign and waiting period provisions of its ordinance. These amendments expressly allow noncommercial speech wherever the ordinance permits commercial speech, and require the county zoning administrator to decide on applications for temporary sign permits within twenty-four hours.[11] The Political Parties then moved this court to dismiss as moot the County's appeal on these three provisions. The County contested this motion, reasoning that the amendments merely clarified the County's historical interpretation and application of these provisions.
 
 
 40
 We deny this motion, because the validity of the district court's decision with respect to the original commercial establishment, portable sign, and waiting period provisions may affect the amount of the attorneys' fees award. The district court awarded attorneys' fees to the Political Parties for their significant contribution in changing an unconstitutional law. Since we find that only the two-sign limit was subject to constitutional attack, we cannot say that the Political Parties significantly contributed to any change in the other three provisions. The district court may wish to modify the attorneys' fees award to reflect this result.[12]
 
 
 41
 However, the County's amendments do moot the district court's permanent injunction enjoining enforcement of the commercial establishment, portable sign and waiting period provisions. Thus, we vacate the injunction with respect to these three provisions.
 
 V
 
 42
 For the reasons stated herein, we affirm the district court with respect to its invalidation of the two-sign limit, but reverse the decision with respect to the commercial establishment, portable sign, and waiting period provisions. Because the County subsequently amended the latter three provisions, the practical effect of this reversal is to vacate and remand the award of attorneys' fees for further consideration by the district court. Finally, we vacate the permanent injunction with respect to the commercial establishment, portable sign, and waiting period provisions, because the County's subsequent amendment of these provisions renders that part of the injunction moot.
 
 
 43
 AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.
 
 
 44
 NIEMEYER, Circuit Judge, concurring in part and dissenting in part:
 
 
 45
 Arlington County, Virginia, has adopted an ordinance that permits only one sign to be posted on private residential property "for each principal dwelling unit."* No effort has been made to regulate the content of the sign's message or to favor one type of message over another. The number-of-signs limitation was adopted as part of a comprehensive sign-regulating ordinance designed to "reduce ... traffic hazards," "ensure the effectiveness of public traffic signs," "protect property values," "provide an attractive visual environment," "protect the character and appearance of ... neighborhoods," "assist tourists," "protect the public investment," and "protect and improve the public health, safety and general welfare." Arlington Co.Code, § 34 (adopted by Ord. No. 90-39, Dec. 8, 1990).
 
 
 46
 The political party plaintiffs and the public interest groups representing them contend that the ordinance impermissibly burdens the right of free speech secured by the First Amendment, particularly because its scope reaches to prohibit political campaign advertising. The district court agreed and held the provision unconstitutional, concluding that the County did not narrowly tailor the two-sign limit to further its interests in promoting aesthetics and traffic safety, and that the ordinance leaves open no viable alternative means of political speech. In Part II of its opinion, the majority has affirmed this portion of the district court's decision. I believe the ordinance permissibly regulates sign structures, furthering the public interest in promoting aesthetics and safety while making no effort to regulate the content of the message conveyed and leaving open ample alternatives for communication. I would, therefore, affirm the constitutionality of the ordinance and reverse the district court.
 
 
 47
 Although the preservation of the free exchange of ideas and information is central to the First Amendment, no one urges that just because a sign structure is used as a medium for communication, it must therefore be allowed to exist in any configuration and in any location. Rather, controlling precedent has recognized that government may exercise its police power and regulate sign structures for safety and aesthetic reasons so long as speech is not targeted and the regulation of the signs' noncommunicative aspect is narrowly tailored so that it does not unnecessarily infringe on speech. See Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); Metromedia, Inc. v. San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); Naegele Outdoor Advertising, Inc. v. Durham, 844 F.2d 172 (4th Cir.1988). The appropriate First Amendment analysis seeks to preserve the communication of ideas and speech to the greatest extent possible while at the same time permitting appropriate regulation of collateral but related conduct and media. See United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); D.G. Restaurant Corp. v. Myrtle Beach, 953 F.2d 140 (4th Cir.1991).
 
 
 48
 The ordinance at issue here goes to great lengths in describing the nature of permissible sign structures, their location, their number, and their size. See e.g., Arlington Co.Code, § 34.A-34.F. The careful detail found in the ordinance's treatment of these issues confirms its sincerity in pursuing the announced purpose of improving aesthetics and protecting the health, safety, and welfare of the community. Such a regulation undoubtedly imposes some burden on free speech at particular locations and through a particular medium. It is a difficult argument to make, however, that this ordinance limits to even a small extent the ability of a person in the community to communicate ideas and information, given the availability of other means of disseminating a message. Moreover, the ordinance in this case allows at least one sign per dwelling unit, an obvious compromise in which the County balanced its right to ban all structural signs against the wish of some to use such signs.
 
 
 49
 If Arlington County had concluded that any proliferation of signs in residential neighborhoods blighted the affected areas, the most direct response would have been to ban all signs in residential neighborhoods. The fact that the county permits two signs is a compromise of its aesthetic purity, but that tolerance surely cannot be considered a less narrowly tailored regulation than an overall ban. See Vincent, 466 U.S. at 811, 104 S.Ct. at 2132.
 
 
 50
 Notwithstanding the political parties' argument to the contrary, the ordinance in this case is not directed at political speech but applies, by its terms, to all signs. While any regulation of structures that are intended for communicative use imposes some burden on the ability of political candidates to communicate, I cannot conclude that this burden significantly impedes the ability of a candidate to inform the citizens of Arlington County about his ideas. The candidate can reach the voters equally effectively through speeches, door-to-door canvassing, handbills, meetings, advertising signs in local businesses and on automobiles, and indeed, through the one sign still authorized in front of each dwelling. Because I believe that the County's two-sign limitation as currently drafted satisfies all constitutional demands, I would reverse the decision of the district court and uphold the constitutionality of the ordinance. I therefore respectfully dissent from the majority's decision in Part II of its opinion. I join in the remainder.
 
 
 
 [1]
 Specifically, the relevant sections provided:
 § 34 F. Signs Permitted in All Districts With Permits
 ....
 
 
 [4]
 Temporary noncommercial signs are permitted in residential districts subject to the following:
 ....
 f. No more than one (1) sign is permitted for each principal dwelling unit.
 g. The sign may be freestanding or placed in a window.
 (The County construes § 34 E.7., permitting "one (1) non-commercial or 'for sale,' 'rent,' or 'lease' sign," to allow one additional sign per residence. Thus, these sections combined create the two-sign limit.)
 § 34 A. Administration
 
 
 [1]
 A sign permit shall be obtained from the zoning administrator before any sign or advertising structure is erected.... A sign permit shall be approved or rejected within seven (7) work days. Upon request, a statement of the reasons for denial of a sign permit shall be provided within thirty (30) days after rejection
 § 34 C. Prohibited Signs
 The following types of signs are prohibited and shall not be permitted by variance:
 ....
 
 
 [7]
 Any portable sign, including any signs displayed on a vehicle which is used primarily for the purpose of such display. This shall not include identification signs on vehicles identifying the owner of the vehicle, or bumper stickers
 § 34 G. Signs permitted in All "C" and "M" Districts With Permits.
 Business signs identifying the products or services available on the premises or advertising a use conducted thereon may be displayed in 'C' and 'M' Districts....
 
 
 [2]
 The County also briefly cites to Burson v. Freeman, --- U.S. ----, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), where the Court upheld a complete ban on temporary, political signs within 100 yards of polling places. However, in that case the Court upheld the ordinance as a reasonable means to further two compelling governmental interests of protecting the right of citizens to vote freely for candidates of their choice and conducting an election with integrity and reliability. In the present case, the County does not claim that its ordinance serves these compelling governmental goals
 
 
 [3]
 The Court noted that it had previously upheld similar restrictions in summary decisions, but had never addressed such an ordinance after full, plenary review. Metromedia, 453 U.S. at 500, 101 S.Ct. at 2888
 
 
 [4]
 Moreover, both the plurality opinion and concurring opinion recognized the inherently unique qualities of billboards. Id. at 502, 101 S.Ct. at 2889 ("[B]ecause it is designed to stand out and apart from its surroundings, the billboard creates a unique set of problems for land use planning and development."); Id. at 528, 101 S.Ct. at 2903 (Brennan, J., concurring) ("It is obvious that billboards do present their own unique problems: they are large immobile structures that depend on eye-catching visibility for their value.")
 
 
 [5]
 At least one other court distinguished billboard restrictions from temporary political sign restrictions. City of Antioch v. Candidates' Outdoor Graphic Service, 557 F.Supp. 52, 58 (N.D.Cal.1982). ("Permanent, fixed structures like billboards are a medium different from small, detachable political signs and present different regulatory problems.")
 
 
 [6]
 The 1991 Arlington County general election contained at least seven contested elections
 
 
 [7]
 See, e.g., Verrilli v. City of Concord, 548 F.2d 262, 265 (9th Cir.1977), (court invalidated an ordinance regulating signs because the city "failed to meet its burden [of] demonstrating the necessity of [its] restriction to further a legitimate government interest")
 
 
 [8]
 The County apparently recognizes this since its ordinance limits sign posting from seventy days before the event to ten days after
 
 
 [9]
 Notably, posting signs in local businesses and automobiles violates the commercial establishment and portable sign provision as written. Only the County's interpretation of these sections allows this activity. See infra part III
 
 
 [10]
 See also, Beck v. Communications Workers of America (C.W.A.), 776 F.2d 1187, 1199 (4th Cir.1985), where this court interpreted Supreme Court precedent to establish the principle that:
 a statute challenged for unconstitutionality under the First Amendment may be sustained if, as a result of a reasonable narrowing construction consonant with the legislative purpose reflected in the statute, the constitutional objective may be removed or obviated.
 
 
 [11]
 The specific amendments included:
 A. With respect to the waiting period, the County added the following language to § 34 A.1.:
 A sign permit for any temporary sign that requires a permit shall be approved or rejected within 24 hours of the receipt of a sign permit application. If the permit is denied, the reason for the denial will be given orally, with a written reason provided within five days, if requested.
 B. To clarify the portable and commercial dwelling sign provisions, the County added § 34 A.4., which states:
 Wherever commercial speech is permitted on a sign under this section of the ordinance, non-commercial speech also is permitted.
 
 
 [12]
 We express no opinion as to the appropriate amount of attorneys' fees which may be awarded by the district court
 
 
 *
 Because the County's ordinance also allows one temporary sign advertising a house for sale, rent, or lease, or advertising the services of those performing work at a particular site, the restriction has been referred to as a "two-sign limit."